Filed 12/16/21  P. v. Ramos-Perez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079072 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. C1652704) |
| VALENTIN RAMOS-PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Santa Clara County, Linda R. Clark, Judge.  Affirmed as modified.

Michael C. Sampson for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Donna M. Provenzano and Melissa A. Meth, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Ramos-Perez appeals from a judgment of conviction entered after a jury convicted him of multiple counts of aggravated sexual assault of a child by rape and sexual penetration, as well as offenses related to his use of physical restraint to attempt to prevent the victim's mother from reporting his sexual misconduct.

On appeal, Ramos-Perez raises three principal arguments. First, Ramos-Perez contends that his convictions on multiple counts of aggravated sexual assault of a child by rape and sexual penetration must be reversed because the trial court failed to instruct the jury, sua sponte, with respect to several lesser included offenses, including the lesser included offenses of unlawful sexual intercourse with a child and unlawful sexual penetration of a child.

Second, Ramos-Perez contends that the trial court erred in admitting expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS), as well as in instructing the jury with CALCRIM No. 1193, related to the use of CSAAS evidence.

Finally, Ramos-Perez contends that his concurrent sentence for false imprisonment must be stayed pursuant to Penal Code[1] section 654 because it was part of the same course of conduct as his conviction for witness intimidation. The People concede that the court should have stayed imposition of sentence on the false imprisonment count.

Although we agree with Ramos-Perez that the trial court had a sua sponte duty to instruct the jury with respect to the lesser included offense of

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

unlawful sexual intercourse with a minor, as provided in section 261.5, subdivision (c), with respect to counts 2 through 6, we conclude that the error in failing to instruct on that lesser included offense was not prejudicial.

We reject Ramos-Perez's additional contentions regarding the failure to instruct on other offenses that he contends are lesser included offenses of counts 7 through 10 under the accusatory pleading test. We also reject Ramos-Perez's contention that the trial court committed both evidentiary and instructional error with respect to the CSAAS evidence.

However, as the People concede, the trial court erred in failing to stay imposition of the sentence imposed for false imprisonment pursuant to section 654.

We therefore modify the judgment to stay the sentence on count 12, the false imprisonment count, and affirm the judgment as modified.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *J.D.'s description of Ramos-Perez's sexual abuse*

J.D. was born in 2003 and was fifteen years old at the time of trial. When J.D. was 11, Ramos-Perez began renting a room in the home that J.D. lived in with her mother, G.G.-R., and her sisters. While Ramos-Perez lived with them, he and G.G.-R. entered into a sexual relationship. G.G.-R. became pregnant with his child. After G.G.-R. became pregnant, Ramos-Perez moved out, but he returned to the home after their daughter was born, which was in or around April 2016. At this point, J.D. was 12 years old.

A few months after Ramos-Perez moved back in with J.D. and her family, in June or July, Ramos-Perez began touching J.D. in a sexual manner. The first incident occurred after Ramos-Perez, J.D., and one of

3

J.D.'s sisters had gone to a pool. When the group returned from the pool, Ramos-Perez told J.D.'s sister to take a shower. While Ramos-Perez and J.D. were alone in the bedroom, Ramos-Perez told J.D. to sit next to him on the bed. J.D. asked why and Ramos-Perez again told her to come to the bed. When she again asked why, Ramos-Perez grabbed her arm and sat her down on the bed. Ramos-Perez touched J.D.'s thighs and then moved his hand up to her underwear. Ramos-Perez rubbed her vagina over her underwear. J.D. had never been touched in that manner before, and she felt uncomfortable. She tried to get up, but Ramos-Perez held her down. J.D. told him to stop and tried to pull his hand away, but he just rubbed harder.

J.D. testified that Ramos-Perez told her not to tell her mother. J.D. did not tell her mother; she was afraid that Ramos-Perez would hurt her or her family. Ramos-Perez was aggressive at times, and he had told J.D. that he had been in trouble before for hurting another woman.[2] J.D. was also afraid that her mother would not believe her if she told her about the sexual abuse.

J.D. described another incident that took place after J.D.'s family and Ramos-Perez had gone to a pool. After the visit to the pool, Ramos-Perez dropped the rest of the family at home, and he and J.D. went to get pizza. J.D. sat in the back seat of Ramos-Perez's vehicle. On the way home from the restaurant, Ramos-Perez stopped and parked the car. He placed a blanket in such a way as to cover the windshield, and then got in the back seat with J.D. Ramos-Perez started touching J.D.'s thighs, and then put his penis in her vagina. J.D. screamed out in pain. She described that it felt "[l]ike burning, like something ripping inside." Ramos-Perez told J.D. to be quiet, and he started kissing her. J.D. closed her mouth, and she tried to hold her legs

---

[2]     Ramos-Perez was twice convicted for domestic violence involving a female victim.

4

closed. Ramos-Perez used his legs to push her legs apart. J.D. was unable to get Ramos-Perez to stop. He was on top of her and the car doors were locked. Ramos-Perez continued having sexual intercourse with J.D. for a few minutes while J.D. stared up at the roof of the car. When Ramos-Perez finally got up, J.D. put on her underwear.

J.D. recounted another incident when G.G.-R. left J.D. home alone with Ramos-Perez; Ramos-Perez said that he needed J.D.'s help cleaning the back yard. J.D. and Ramos-Perez cleaned up the yard, and J.D. then helped Ramos-Perez move some luggage into another room. When they were inside that room, Ramos-Perez grabbed J.D. and pulled her to the floor. He touched her vagina with his fingers. She did not want him touching her and tried to make him stop, but he was on top of her. She stared at the ceiling while he touched her. He stopped when he heard a noise outside. Later, he entered her bedroom and locked the door. He sat next to her and started touching her. He got on top of her and put his fingers in her vagina.

According to J.D., Ramos-Perez put his fingers in her vagina more than 10 times on different days. She described the encounters as typically beginning with Ramos-Perez sitting next to her, after which he would hold her down and put his fingers in her vagina. Sometimes he stood behind her and touched her vagina with his fingers. One time he touched her breasts while he rubbed her vagina. Another time, J.D. testified, Ramos-Perez put his mouth on her vagina briefly.

J.D. testified that Ramos-Perez put his penis in her vagina more than five times, and possibly more than 10 times. On one occasion, he came up behind her and told her to get down. He pulled her leggings down, but kept her skirt on, and put his penis in her vagina. Another time, as she was

5

changing the baby's diaper, Ramos-Perez came up behind her and put his penis in her vagina.

J.D. testified that she never wanted Ramos-Perez to touch her. She would ask him to stop, but he would ignore her. Sometimes Ramos-Perez held her down. J.D. would try to move away from him, but she was unable to do so. J.D. explained that after Ramos-Perez would touch her inappropriately, he would tell her to act normally. He also told her not to tell her mother. J.D. was confused and scared. She felt that she had to do what Ramos-Perez told her or he would hurt her mother or sisters.

The final incident occurred on the morning of December 4, 2016, when G.G.-R. caught Ramos-Perez appearing to get dressed while alone in a room with J.D. The family had gone to an event the night before and when they came home, Ramos-Perez was intoxicated. He slept on the floor and G.G.-R. and the girls slept in G.G.-R.'s bed. G.G.-R. had trouble sleeping. Early in the morning, between 4:00 and 6:00, G.G.-R. and the other girls moved to beds in another room, which left J.D. alone in G.G.-R.'s bed. G.G.-R. fell asleep. Later, G.G.-R. woke up and heard the bed in her bedroom moving. She quickly went to check and saw Ramos-Perez getting off the bed. His pants were open and his penis was exposed and erect. J.D. was lying on the bed on her back. Her skirt was up and her underwear was down. J.D. appeared to be asleep. G.G.-R. woke up J.D., who appeared "hypnotized" and "scared." G.G.-R. took J.D. to a closet to check on her body; J.D.'s vagina was wet with what appeared to be semen.

G.G.-R. confronted Ramos-Perez, but he denied having done anything to J.D. G.G.-R. grabbed a belt and hit him in the legs. She said that she was going to call the police, but Ramos-Perez blocked her from getting to her phone. Ramos-Perez grabbed G.G.-R. by the arms and threw her on the bed,

6

preventing her from leaving the room.  Ramos-Perez told G.G.-R. that if she called the police, she would be "running a risk," which she interpreted to mean that he planned to get revenge.  He told her that he would send someone to kill them after he was released from jail.  G.G.-R. was afraid for herself and her daughters.

Ramos-Perez eventually let G.G.-R. leave the room after she told him that she would not call the police.  She grabbed her daughters and left the house.  They drove to a hospital.  While they were in the parking lot of the hospital, G.G.-R. asked J.D. "a bunch of questions" and was asking her to "tell . . . the truth [about] what happened."  J.D. told her mother about some of the incidents with Ramos-Perez, but did not tell her everything because she was worried about how her mother would react.  While they were in the parking lot, G.G.-R. called 911 and reported what had happened.  Police arrived at the hospital about 20 minutes later.

### 2. *Physical evidence*

J.D. underwent a Sexual Assault Response Team (SART) examination at around 1:00 a.m. on December 5, 2016.  Ramos-Perez's DNA was found on swabs taken from J.D.'s labia, posterior fourchette, clitoral hood, and deep inside her vagina.

### 3. *Ramos-Perez's statements to police*

Police officers arrested Ramos-Perez and interviewed him on December 4, 2016.  He initially denied any wrongdoing.  He stated that he had awakened at around 9:30 a.m. that day and was getting dressed quickly so that he would not be late for work.  Ramos-Perez told officers that when G.G.-R. saw him in the bedroom, he had merely been zipping up his pants, and his penis was not out or erect.  He maintained that he was not lying.

However, later in the interview, Ramos-Perez changed his account. He told the officers that he and J.D. got along well, and that over time, J.D. wanted his affection and would get "close" to him. J.D. would become angry when Ramos-Perez and G.G.-R. were together. Ramos-Perez once joked to G.G.-R. that maybe J.D. "liked" him. Ramos-Perez told G.G.-R. not to leave J.D. alone with him. Eventually, Ramos-Perez, explained, he had "made a mistake" and had sexual intercourse with J.D. He claimed that J.D. "wanted it," and that she had told him that she loved him. According to Ramos-Perez, J.D. told him not to tell her mother.

Ramos-Perez initially told police that he had sexual intercourse with J.D. two or three times. He then said that it was four or five times, and later said that it was five or six. Finally, Ramos-Perez said that it had happened six or seven times. He admitted that he had had sexual intercourse with J.D. that morning, but he contended that G.G.-R. had not seen anything. He also admitted to the officers that he knew that it was wrong to have sexual intercourse with a minor; he further asserted that he had told J.D. that he could not be with her because he could go to jail, but she told him that she would not tell anyone.

Despite his admission that he had engaged in sexual intercourse with J.D. multiple times, Ramos-Perez denied having put his fingers inside J.D.'s vagina. He said that he would "grab" her vagina, but stated that he had not put his fingers inside of her. He also specifically denied having had anal or oral sex with J.D.

4. *Expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS)*

Dr. Blake Carmichael is a clinical psychologist who specializes in treating sexually abused children. He testified as an expert regarding

8

CSAAS at trial. Dr. Carmichael had no personal knowledge about the facts of the case. Dr. Carmichael testified that CSAAS is an educational tool to help people understand children who have been sexually abused, and explained that it was developed based on common reactions to sexual abuse. There are five components to CSAAS: secrecy, helplessness, entrapment or accommodation, delayed disclosure, and retraction. Dr. Carmichael testified that decades of research supports CSAAS as a tool. Dr. Carmichael testified that the delayed disclosure component of the syndrome means that it is rare for children to report sexual abuse right away. He testified that 80 percent of abuse victims do not disclose abuse right away.

B. *Procedural background*

On May 14, 2019, the Santa Clara County District Attorney filed a second amended information charging Ramos-Perez with assault with intent to commit rape or sexual penetration of an unconscious minor (Pen. Code,[3] § 220, subd. (a)(2); count 1); five counts of aggravated sexual assault of a child under 14 by rape (§ 269, subd. (a)(1); counts 2–6); four counts of aggravated sexual assault of a child under 14 by sexual penetration (§ 269, subd. (a)(5); counts 7–10); attempting to dissuade a witness (§ 136.1, subd. (b)(1); count 11); and felony false imprisonment (§ 236; count 12).[4]

The following day, a jury found Ramos-Perez guilty on all counts.

---

[3] Further statutory references are to the Penal Code unless otherwise indicated.

[4] This amended information was filed during trial; the charging document made minor changes to the text of the first amended information, and also omitted a thirteenth count that had been charged in the first amended information.

9

In September 2019, the trial court sentenced Ramos-Perez to 135 years to life, plus a consecutive determinate term of 8 years four months.[5]

Ramos-Perez filed a timely notice of appeal.

III.

DISCUSSION

## A. *Lesser included offenses*

Ramos-Perez contends that the trial court prejudicially erred in failing to instruct the jury, sua sponte, as to two offenses that he contends are lesser included offenses of aggravated assault of a child by rape, with which he was charged in counts 2 through 6, and as to a separate offense that he contends is a lesser included offense of aggravated assault of a child by sexual penetration, with which he was charged in counts 7 through 10.

### 1. *Relevant legal standards*

A trial court has a sua sponte duty to instruct the jury on a lesser included offense when there is substantial evidence that the lesser offense, but not the greater, was committed. (*People v. Bell* (2019) 7 Cal.5th 70, 108; see *People v. Breverman* (1998) 19 Cal.4th 142, 154, 162 (*Breverman*).) There are two tests for determining whether a lesser offense is necessarily included in another offense—the elements test and the accusatory pleading test. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227 (*Reed*); *People v. Smith* (2013) 57 Cal.4th 232, 240 (*Smith*) ["For purposes of determining a trial court's instructional duties, [the Supreme Court has] said that 'a lesser offense is necessarily included in a greater offense if either the statutory elements of

---

5    The determinate portion of the sentence consisted of a seven-year term on count 1, a consecutive 16-month term on count 11, and a concurrent 16-month term on count 12. The indeterminate portion consisted of consecutive 15 years to life terms on each of the aggravated sexual assault offenses in counts 2 through 10.

10

the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser' "].)

"Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*Reed, supra*, 38 Cal.4th at p. 1227.)

Under the accusatory pleading test, a lesser offense is included within the greater charged offense if the charging allegations of the accusatory pleading describe the offense in such a way that if committed as described, the lesser offense is necessarily committed. (*People v. Lopez* (1998) 19 Cal.4th 282, 288.) When applying the accusatory pleading test, "[t]he trial court need only examine the accusatory pleading." (*Smith, supra*, 57 Cal.4th at p. 244.) "[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense." (*Ibid.*) Enhancements may not be considered as part of an accusatory pleading for purposes of identifying lesser included offenses. (*People v. Wolcott* (1983) 34 Cal.3d 92, 96, 100–101 (*Wolcott*); *People v. Woods* (2015) 241 Cal.App.4th 461, 473, 480, 482 (*Woods*); *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1398 (*Bragg*).)

We review de novo whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

2. *Ramos-Perez's contentions regarding lesser included offenses of aggravated assault of a child by rape*

Ramos-Perez contends that the trial court had a duty to instruct the jury sua sponte on two different offenses as lesser included offenses of

11

aggravated sexual assault of a child by rape (§ 269, subd. (a)(1)) as charged in counts 2 through 6:  (1) unlawful sexual intercourse with a minor where the defendant is more than three years older than the victim (§ 261.5, subd. (c)), and (2) unlawful sexual intercourse with a minor where the defendant is 21 or older and the victim is under 16 (§ 261.5, subd. (d)).  The People concede that the offense set forth in section 261.5, subdivision (c) is a lesser included offense of the offenses charged in counts 2 through 6 under the elements test, but argue that there was insufficient evidence to support the giving of an instruction on that offense, and/or that any failure to instruct was harmless. The People disagree with Ramos-Perez that the offense set forth in section 261.5, subdivision (d) is a lesser included offense under either the elements test or the accusatory pleadings test.

> a.  *The trial court had a sua sponte duty to instruct on the offense of unlawful sexual intercourse with a minor under 261.5, subdivision (c) as a lesser included offense of aggravated sexual assault of a child by rape as set forth in section 269, subdivision (a)(1), as to counts 2 through 6, however, the error in failing to do so was not prejudicial*

Ramos-Perez was charged in counts 2 through 6 with violating section 269, subdivision (a)(1), which provides, "Any person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child:  (1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261."  Forcible rape "is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."  (§ 261, subd. (a)(2).)  To prove aggravated sexual assault of a child by rape, the prosecution was required to prove that (1) the defendant had sexual intercourse with a child; (2) he and the child were not married at the time of the intercourse; (3) the child did not consent

12

to the intercourse; (4) the intercourse was accomplished by force, violence, duress, menace or fear of immediate and unlawful bodily injury to the child or someone else; and (5) the defendant acted when the child was under 14 years old and at least seven years younger than the defendant.  (CALCRIM Nos. 1123, 1000; §§ 269, subd. (a)(1), 261, subd. (a)(2).)

In order to establish a violation of section 261.5, subdivision (c), the prosecution must prove the following elements:  (1) the defendant had sexual intercourse with a minor; (2) the defendant and the minor were not married to each other at the time of the intercourse; and (3) at the time of the intercourse, the minor was under the age of 18 and more than three years younger than the defendant.  (CALCRIM No. 1071; § 261.5, subd. (c).)  As the People concede, section 261.5, subdivision (c), is a lesser included offense of section 269, subdivision (a)(1) under the elements test because the elements of the lesser offense are necessarily included in the elements of the greater, given that one cannot rape a child under the age of 14 and more than 7 years younger than the perpetrator without also having sexual intercourse with a minor who is more than 3 years younger than the perpetrator.  (See §§ 261.5, subd. (c); 269, subd. (a)(1).)

The People assert, however, that the trial court did not have a sua sponte duty to instruct the jury with respect to the offense set out in section 261.5, subdivision (c) as a lesser included offense as to counts 2 through 6 because the evidence is insufficient to support the giving of such an instruction.  In this context, substantial evidence to support the giving of a lesser included offense instruction is evidence " 'substantial enough to merit consideration' by the jury.  [Citation.]" (*Breverman, supra*, 19 Cal.4th at p. 162.)  Evidence is substantial if " ' "a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was

13

committed." (*Ibid.*) In considering whether there is substantial evidence to support the giving of a lesser included offense instruction, we do "not evaluate the credibility of witnesses, a task for the jury," (*ibid.*) and we "view[ ] the evidence in the light most favorable to the [defendant]." (*Id.* at p. 186.)

On this record, there was substantial evidence from which a jury could conclude that Ramos-Perez did not use force or fear to accomplish the sexual intercourse with J.D. During a recorded interview with Ramos-Perez—an interview that was admitted in evidence at trial and played for the jury— Ramos-Perez explained that he had sexual intercourse with J.D. multiple times over the prior few months. He stated that J.D. had become attached to him and sought out his affection. According to Ramos-Perez, J.D. eventually told him that she was in love with him and asked him to have sex with her. Ramos-Perez told the officers that even though he knew that having sex with J.D. was wrong, he agreed to do it anyway. If the jury were to credit Ramos-Perez's version of events and reject J.D.'s, the jury could have found that Ramos-Perez did not use force, violence, duress, menace or fear of immediate and unlawful bodily injury in having intercourse with J.D. Thus, Ramos-Perez could be found guilty of unlawful sexual intercourse under section 261.5, subdivision (c), and not aggravated sexual assault of a child by rape.[6] We therefore conclude that there was substantial evidence to support the giving of an instruction on the lesser included offense of unlawful sexual intercourse with a minor under section 261.5, subdivision (c), and that the

[6] To be clear, we do not intend to suggest that a jury *would* credit Ramos-Perez's version of events over J.D.'s. Our review with respect to this issue is simply to determine whether there is substantial evidence to warrant the giving of the instruction; again, in doing so, we do not weigh the credibility of the witnesses. (See, e.g., *Breverman, supra*, 19 Cal.4th at p. 162.)

trial court erred in not instructing the jury with respect to that offense as to counts 2 through 6.

We next consider whether the trial court's error in not instructing the jury sua sponte with an instruction on the lesser included offense of unlawful sexual intercourse (§ 261.5, subd. (c)) was prejudicial. We ultimately conclude that the error did not prejudice Ramos-Perez.

We review the failure to instruct on a lesser included offense for prejudice under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (See *Breverman, supra*, 19 Cal.4th at p. 165 [failure to instruct on lesser included offense is error of California law alone and therefore subject to state standards of reversibility].)[7] Under this standard, the failure to instruct on a lesser included offense "is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Ibid.*) In applying this standard, we focus "not on what a reasonable jury could do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Id.* at p. 177, italics omitted.) In assessing what a jury is likely to have done in the absence of the error, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Ibid.*, italics omitted.)

---

7    Ramos-Perez also argues that the trial court's failure to instruct the jury sua sponte on the identified lesser included offenses amounted to federal constitutional error. We reject this contention. The Supreme Court has observed that the rule requiring sua sponte instructions on lesser included offenses in noncapital cases is a rule of California state law only; there is no similar requirement imposed by the federal Constitution in noncapital cases. (*Breverman, supra*, 19 Cal.4th at p. 169.)

15

Our review of the record demonstrates that the evidence supporting a finding that Ramos-Perez did not use force, violence, duress, menace or fear of immediate and unlawful bodily injury in having intercourse with J.D. is comparatively weak, while the evidence supporting the jury's verdicts on counts 2–6 is relatively strong, such that there is no reasonable probability that the lack of a lesser included offense instruction with respect to those counts affected the result. The record demonstrates that the only evidence supporting Ramos-Perez's contention that he did not use force, fear or duress was his interview with police. In that interview, Ramos-Perez initially denied ever having any sexual contact with J.D., and only later admitted that he had engaged in intercourse with J.D. on multiple occasions. As to the conduct underlying counts 2 through 6, Ramos-Perez contended that his young victim, who was only 12 or 13-years old at the time, "wanted it." Ramos-Perez continued to deny ever having put his fingers in J.D.'s vagina with respect to counts 7–10. The jury viewed the video recording of Ramos-Perez's interview with police and was able to see that he repeatedly lied before making any of the admissions and sought to minimize his conduct throughout the interview. After considering this interview, the jury rejected Ramos-Perez's version of the facts underlying counts 1 and 7 through 10 (the latter of which included an element of force, fear, or duress). We conclude that there is no reasonable probability that the jury would have reached a different result as to counts 2 through 6 if the court had given an instruction on unlawful sexual intercourse with a minor. It is not reasonably likely that the jury would have concluded that Ramos-Perez forcefully penetrated J.D. with his fingers and raped her while she was unconscious or asleep, but that J.D. willingly initiated nonforceful sexual intercourse with Ramos-Perez on

16

other occasions.[8]  In other words, it is not reasonably likely that a jury would have credited some of Ramos-Perez's statements (i.e., that the intercourse was consensual) while rejecting others (i.e., that no penetration with his fingers ever occurred), particularly when his self-serving statements were juxtaposed with J.D.'s consistent statements about the abuse.  As a result, any error in failing to instruct the jury on the lesser included offense of unlawful sexual intercourse with a minor under section 261.5, subdivision (c) with respect to counts 2 through 6 was harmless and reversal is not required.

b. *The trial court did not have a sua sponte duty to instruct on the offense set forth in 261.5, subdivision (d), because that offense is not a lesser included offense of aggravated sexual assault of a child by rape under either the elements test or the accusatory pleading test*

The parties agree that, unlike the offense set forth in section 261.5, subdivision (c), the offense set forth in section 261.5, subdivision (d), is *not* a lesser included offense of aggravated sexual assault of a child by rape under section 269, subdivision (a)(1) under the elements test.  Specifically, section 261.5, subdivision (d), requires that the defendant be at least 21 years old at the time of the unlawful intercourse.  (§ 261.5, subd. (d); CALCRIM No. 1072.)  Section 269, subdivision (a)(1), contains no such requirement and thus, the elements test is not met.

Ramos-Perez argues, however, that section 261.5, subdivision (d), is a lesser included offense of section 269, subdivision (a)(1) pursuant to the accusatory pleading test.

---

[8]     We are mindful of the fact that the jurors were instructed that if they concluded that Ramos-Perez committed one or more of the crimes, the jurors could use his guilt as to those offenses as propensity evidence in order to conclude that he was likely to commit the other charged offenses.

The information does not contain any allegation that refers to Ramos-Perez's age at the time of the offenses.  Rather, in each of counts 2 through 6, the information alleges only that Ramos-Perez raped "a child who was 12–13 years old and who was both under the age [of] fourteen (14) years and seven [or] more years younger than the defendant."[9]  Given this allegation regarding the age difference between Ramos-Perez and the victim, it would be possible, based on the language of the information, for Ramos-Perez to have been under 21 years old at the time of the offenses.  It is thus clear that the allegations of the charging document do not necessarily accuse Ramos-Perez of violating section 261.5, subdivision (d), given that the accusatory pleading does not allege that he was 21 years of age or older when he committed the offenses charged in counts 2 through 6.

Ramos-Perez contends that because the caption on the information included a presumed birthdate for Ramos-Perez, the accusatory pleading sufficiently alleged that Ramos-Perez was 21 years or older at the time of the charged offenses.  Ramos-Perez cites no authority, and we are aware of none, indicating that we may use a birthdate that is included in a caption of a charging document in applying the accusatory pleading test.  In his reply brief, Ramos-Perez suggests that *People v. Thompson* (1908) 7 Cal.App. 616 (*Thompson*), permits us to rely on data provided in the caption of a charging document to supply information necessary for concluding that an offense is a lesser included offense of a charged offense under the accusatory pleading test.  We find this authority unpersuasive.

In *Thompson*, there was a blank space left after the words " 'said [c]ounty of' " in the body of the charging document.  (*Thompson, supra,*

---

9    None of the other counts include an allegation that Ramos-Perez was 21 years old or older at the time he committed the offenses.

18

7 Cal.App. at p. 617.)  After noting that it was "evident that the failure to insert in the information the name of the county in the blank space immediately following the words 'said county of' involves purely a clerical misprision," the *Thompson* court concluded "that for *the purpose of determining the question of venue*, as to which the body of the pleading is silent so far as a direct allegation is concerned, the averment in the information or indictment that the crime was committed in 'said county of _____' should and may reasonably be construed to refer to the county mentioned in the caption as the name or title of the court, and, so construing it, the venue is sufficiently established in the accusatory pleading to invest the court with jurisdiction of the offense and of the person of the accused." (*Id.* at p. 618, italics altered.)

Thompson involved a question of venue and did not purport to comment on whether a court may rely on data provided in the caption of a charging document for purposes of determining whether an offense is a lesser included offense under the accusatory pleading test.  Under the accusatory pleading test, *enhancement allegations* that are alleged with respect to an offense are not considered part of an accusatory pleading for purposes of identifying lesser included offenses.  (*Wolcott, supra*, 34 Cal.3d at p. 96; *Woods, supra*, 241 Cal.App.4th at pp. 473, 480, 482; *Bragg, supra*, 161 Cal.App.4th at p. 1398.)  Given this, it would not be reasonable to conclude that information set forth only in a caption may be considered to be part of an accusatory pleading for purposes of determining a lesser included offense.  We therefore reject Ramos-Perez's reliance on *Thompson* to suggest that we may look to a birthdate provided solely in a caption of a charging document to supply the information necessary to establish that a particular offense is a lesser included offense of a charged offense under the accusatory pleading test.

19

3. *Ramos-Perez's contention regarding a lesser included offense of aggravated assault of a child by sexual penetration*

Ramos-Perez contends that the trial court erred in failing to instruct the jury, sua sponte, on sexual penetration of a child under section 289, subdivision (j), as a lesser included offense of aggravated sexual assault of a child by penetration under section 269, subdivision (a)(5), as alleged in counts 7 through 10. We conclude, for reasons similar to those set forth in section III.A.2.b, that section 289, subdivision (j), is not a lesser included offense of section 269, subdivision (a)(5).

Section 289, subdivision (j), provides, "Any person who participates in an act of sexual penetration with another person who is under 14 years of age and who is more than 10 years younger than he or she shall be punished by imprisonment in the state prison for three, six, or eight years." Section 269, subdivision (a)(5), with which Ramos-Perez was charged in counts 7 through 10, in contrast, requires only a seven-year age difference between the defendant and the victim. Thus, section 289, subdivision (j) is not a lesser included offense of section 269, subdivision (a)(5) under the elements test.

Ramos-Perez contends, however, that section 289, subdivision (j) is a lesser included offense under the accusatory pleading test. The charging document alleges that the victim was "seven and more years younger than the defendant(s)"; there is no allegation that the victim was 10 years younger than Ramos-Perez. Again, Ramos-Perez relies on the fact that the caption of the charging document includes a birthdate to argue that the trial court should have instructed the jury on the offense described in section 289, subdivision (j) as a lesser included offense of the offense charged in counts 7 through 10. As we have explained, there is no authority to support reliance on data in the caption of a charging document to supply the allegations

necessary to establish that a particular offense is a lesser included offense of a charged offense under the accusatory pleading test. We therefore reject the contention that section 289, subdivision (j) is a lesser included offense of section 269, subdivision (a)(5) under the accusatory pleading test.

B. *The trial court's admission of expert testimony on CSAAS and the instruction regarding the use of CSAAS evidence*

1. *The court did not err in allowing the prosecution to present expert testimony on CSAAS*

Prior to trial, the parties filed competing motions in limine regarding the admissibility of CSAAS testimony. The court ruled that the CSAAS testimony was admissible, concluding that it would be "particularly helpful to the jury in dispelling certain common myths and [misconceptions] about how victims and, in particular, child victims of sexual assault react." The court limited the testimony to a general discussion of myths and misconceptions regarding child victims of sexual assault, and did not permit discussion of the specifics of the case. Ramos-Perez contends that the trial court erred in admitting any expert testimony on CSAAS because "it is unreliable, misleading, and will support the conclusion that the complaining witness has been abused in every case," and therefore "creates an impermissible inference of guilt in violation of the federal Constitution."

Ramos-Perez concedes that "California has accepted the admissibility of CSAAS evidence." Nevertheless, he argues, some courts have "acknowledged the inherent problems with such evidence," and "[c]ourts from other jurisdictions have concluded that CSAAS evidence . . . is inherently unreliable." Ramos-Perez devotes a significant portion of his opening brief to a discussion of out-of-state authorities regarding CSAAS evidence. Ramos-Perez then urges this court to conclude that CSAAS evidence is inadmissible

because the "[California] Supreme Court has not directly held that CSAAS evidence is admissible in California."

However, in *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*), the Supreme Court concluded that CSAAS evidence "is admissible to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation."  The Supreme Court explained, " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*Id.* at p. 1301.)  In the wake of *McAlpin*, courts have concluded that CSAAS evidence may in fact be "introduced as part of the prosecution's case-in-chief rather than in rebuttal [and that] [t]he testimony is pertinent and admissible if an issue has been raised as to the victim's credibility."  (See *People v. Patino* (1994) 26 Cal.App.4th 1737, 1745.)  However, the use of CSAAS evidence is limited; it "is not admissible to prove that the complaining witness has in fact been sexually abused" (*McAlpin*, at p. 1300), and "[t]he expert is not allowed to give an opinion on whether a [particular] witness is telling the truth . . . ."  (*People v. Long* (2005) 126 Cal.App.4th 865, 871.)

After *McAlpin,* the Supreme Court reaffirmed the use of CSAAS evidence in sexual misconduct cases when it relied on the reasoning of *McAlpin* to conclude in *People v. Brown* (2004) 33 Cal.4th 892, 906 (*Brown*) that expert testimony explaining the behavior of domestic violence victims may be admissible.  The *Brown* court determined that "[s]imilar reasoning" as that provided in *McAlpin* "supports admissibility of the expert testimony" where, for example, "the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the

22

jurors may well assume that the victim is an untruthful or unreliable witness," and expert testimony regarding the behavior of domestic violence victims would provide jurors with information relevant and necessary to allow them to more objectively evaluate a witness's credibility. (*Brown*, at p. 906.)

More recently, the appellate court in *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*) addressed a challenge, like Ramos-Perez's, to the admission of CSAAS evidence. *Munch* reaffirmed that *McAlpin* remains valid and binding with respect to the admissibility of CSAAS evidence. (*Munch, supra*, 52 Cal.App.5th at p. 468, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [decisions of Supreme Court are binding on other state courts of California].) Other appellate courts have similarly approved of the use of CSAAS evidence for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. (See, e.g., *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*); *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001–1002; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406–407; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956 (*Housley*); *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394.)

Despite the long history of cases affirming the admissibility of CSAAS evidence for a limited purpose in California, Ramos-Perez argues that out-of-state and federal authorities provide support for the conclusion that California should no longer admit CSAAS evidence. The defendant in *Munch*

made a similar argument, and the *Munch* court considered various out-of-state authorities and determined that they did not support the conclusion that CSAAS evidence should no longer be admitted in California, given that the California Supreme Court has *expressly approved* of the use of CSAAS evidence for limited purposes. (*Munch, supra*, 52 Cal.App.5th at p. 469.) We agree with the *Munch* court that the fact "[t]hat other jurisdictions may disagree with [*McAlpin*] does not change [*McAlpin*'s] impact on California cases." (*Id.* at p. 468.)

We decline Ramos-Perez's invitation to not follow *McAlpin* and instead join other jurisdictions that have rejected the use of CSAAS evidence. We are bound by our own Supreme Court's precedent. The trial court in this case permitted the use of CSAAS evidence in precisely the manner approved of by the Supreme Court in *McAlpin*, allowing it to be used to explain that the minor victim's behavior—specifically, her failure to disclose and her inability to remember specifics of certain events—was as consistent with her telling the truth as it was with her not, i.e., the court permitted the use of CSAAS evidence to rehabilitate the minor victim in response to a challenge to her credibility by the defense.[10] We therefore conclude that the trial court did not err in admitting CSAAS evidence under state law evidentiary principles.

_____

[10] During cross-examination, defense counsel inquired as to whether J.D. had "scream[ed] at th[e] time" Ramos-Perez started touching her leg inappropriately on one occasion, thereby suggesting that she should or could have done so if, in fact, the inappropriate touching had occurred. Defense counsel also asked J.D. about her lack of memory about the "exact dates" and "exact times" of the more than 10 incidents that J.D. testified Ramos-Perez "put his fingers in [her] vagina," as well as her lack of memory surrounding where she was, and what day or month it was, when other incidents occurred. In addition, defense counsel questioned J.D. about the fact that she had initially told her mother that "something happened three times," but later had told a detective that, "something happened more times."

Finally, we also reject Ramos-Perez's contention that the admission of the expert's testimony regarding CSAAS violated his rights to a fair trial and due process. Again, Ramos-Perez's contention in this respect rests on his assertion that the CSAAS evidence was inadmissible. We have rejected this assertion and concluded that the CSAAS evidence was admissible for the limited purpose for which it was admitted.[11] Generally, a trial court's compliance with the rules of evidence does not violate a defendant's right to due process. (*People v. Hall* (1986) 41 Cal.3d 826, 834–835.) Because we have concluded that there was no evidentiary error with respect to the trial court's decision to admit the CSAAS evidence, the admission of this evidence did not violate Ramos-Perez's constitutional right to a fair trial or due process. (See *People v. Cage* (2015) 62 Cal.4th 256, 284 ["because the trial court did not abuse its discretion in admitting [the challenged evidence], there was no violation of defendant's constitutional rights" arising from the admission of the evidence].) Many other appellate courts have reached a similar conclusion. (See, e.g., *Lapenias, supra*, 67 Cal.App.5th 162 [admission of CSAAS evidence did not violate due process]; *Patino, supra*, 26 Cal.App.4th at pp. 1744–1745 [same].)

2. *The trial court did not err with respect to its instruction regarding the jury's use of the CSAAS evidence*

Ramos-Perez separately contends that the trial court erred in instructing the jury with CALCRIM No. 1193. According to Ramos-Perez, CALCRIM No. 1193 is defective because the instruction telling jurors that they may consider CSAAS evidence in evaluating the believability of a

---

[11] As we discuss in the following section, the trial court provided an instruction informing the jury of the limitations on its use of the CSAAS evidence.

victim's testimony allows jurors to use CSAAS evidence as evidence of a defendant's guilt by permitting the jury to consider it as evidence that the complaining witness is telling the truth, which violates his federal and state constitutional rights by reducing the prosecution's burden of proof.

### a. *Additional background*

The trial court instructed the jury with CALCRIM No. 1193 as follows:

> "You have heard testimony from Dr. Blake Carmichael regarding child sexual abuse accommodation syndrome. [¶] Dr. Carmichael's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [the child's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

### b. *Analysis*

We review de novo the question whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We consider " 'whether the trial court "fully and fairly instructed on the applicable law." [Citation.] " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" [Citation.] "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible [of] such interpretation." [Citation.]' " (*People v. Wetle* (2019) 43 Cal.App.5th 375, 381–382.)

Ramos-Perez argues that the trial court erred in instructing the jury with CALCRIM No. 1193 because the standard instruction "lightened the prosecution's burden of proof and allowed the jury to draw an impermissible

inference of guilt in violation of appellant's rights under the Fifth, Sixth, and Fourteenth Amendments." He asserts that the standard instruction does not sufficiently address the law as stated in *Housley, supra*, 6 Cal.App.4th at p. 959, which determined that a jury considering CSAAS evidence "must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Ibid.*)

We disagree with Ramos-Perez's contention that the standard instruction on CSAAS effectively permits a jury to use CSAAS evidence as evidence that a defendant committed the charged offenses. Courts have rejected similar arguments. (See *Munch, supra*, 52 Cal.App.5th at p. 474, *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.) For example, the defendant in *Munch* argued that CALCRIM No. 1193 " 'effectively instruct[ed] the jury that they may take [the expert's] testimony as evidence of the defendant's guilt.' " (*Munch*, at p. 474.) " 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.

There is no conflict in the instruction.' " (*Ibid.*, italics omitted, quoting *Gonzales*, at p. 504.) We agree with *Munch* and *Gonzales* that, contrary to Ramos-Perez's claim, CALCRIM No. 1193 does not indicate to the jury that it may consider the expert's testimony as evidence that the defendant committed the crimes charged. To the contrary, the instruction informs the jury that CSAAS evidence is *not* evidence that a defendant committed any of the crimes charged, and instead, that such evidence may be used only in considering whether the conduct of the victims was "not inconsistent" with the conduct of someone who has been molested, and thereby, in evaluating the believability of the victim's testimony. As we have explained, in *McAlpin*, the Supreme Court permitted CSAAS evidence to be used for this limited purpose. (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1301.)

In addition, the trial court instructed with CALCRIM No. 303, which informed the jury that "certain evidence was admitted for a limited purpose," and that the jury was to "consider that evidence only for that purpose and for no other." We presume that jurors understand and follow instructions. (*People v. Erskine* (2019) 7 Cal.5th 279, 303.) We therefore conclude that there is no reasonable likelihood that the jury misapplied CALCRIM No. 1193 and used the CSAAS evidence as evidence of Ramos-Perez's guilt.

C. *The trial court should have stayed imposition of sentence on the false imprisonment conviction pursuant to section 654*

Ramos-Perez contends that the trial court erred in failing to stay imposition of his sentence on the false imprisonment count under section 654.

Pursuant to section 654, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

28

(§ 654, subd. (a).) The purpose of section 654 is to ensure that a defendant's punishment is commensurate with that individual's culpability. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.) In determining whether section 654 applies to require imposition of sentence as to a particular count or counts, a trial court is to determine whether a course of conduct is divisible and therefore gives rise to more than one act; this determination depends on the intent and objective of the defendant. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) If the offenses reflect a single objective, the court may punish the defendant for only one offense. (*Ibid.*) We apply the substantial evidence standard of review to determine whether a defendant harbored a separate intent and objective for each offense (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1414), keeping in mind, however, that the trial court's decision to impose concurrent sentencing reflects an implicit appreciation that counts 11 and 12 involved an objective that was not predominantly independent of each other. (Cf. *People v. Osband* (1996) 13 Cal.4th 622, 730 [a trial court's imposition of consecutive sentences reflects an implicit determination of the existence of more than one objective].)

The People concede that although Ramos-Perez engaged in conduct comprising multiple criminal acts, in that he tried to prevent G.G.-R. from calling the police by throwing her on the bed, physically restraining her, and threatening her with violence, he committed all of those acts with a single objective—i.e., to prevent her from reporting the sexual offense that she had witnessed. The People further concede that although the trial court imposed sentence on the false imprisonment count to run concurrently with the sentence for witness intimidation, under section 654 the trial court should have stayed imposition of sentence on the false imprisonment count. We accept the People's concession. The evidence regarding the offenses charged

29

in counts 11 and 12 reflects that Ramos-Perez acted with a single objective. We will therefore modify the judgment to stay imposition of sentence on count 12, the false imprisonment count.

## IV.

## DISPOSITION

The judgment is modified to stay imposition of the sentence on count 12.  As so modified, the judgment is affirmed.


AARON, J.

WE CONCUR:

HALLER, Acting P. J.

GUERRERO, J.